IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM V. STEWART, | ) | |
| | ) | |
| Petitioner, | ) | 07 C 6017 |
| | ) | |
| v. | ) | |
| | ) | Hon. Charles R. Norgle |
| GREGORY C. SIMS, Warden, | ) | |
| Taylorville Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

CHARLES R. NORGLE, District Judge

Before the court is Petitioner William V. Stewart's Petition for Writ of Habeas Corpus – Person in State Custody, filed pursuant to 28 U.S.C. § 2254. For the following reasons, the Petition is denied.

## I. BACKGROUND

### A. Facts

Petitioner William V. Stewart ("Stewart" or "Petitioner") is currently incarcerated at the Taylorville Correctional Center in Taylorville, Illinois, where he is in the custody of Respondent Gregory C. Sims ("Sims" or "Respondent"), the Warden of that facility. On November 5, 2003, the Illinois Appellate Court affirmed Stewart's convictions and consecutive seven and ten-year sentences for aggravated criminal sexual abuse and criminal sexual assault of a teenage boy. People v. Stewart, 799 N.E.2d 1011 (Ill. App. Ct. 2003). As part of its decision to affirm, the

1

Appellate Court summarized the facts as developed at Stewart's jury trial in the Circuit Court of DuPage County, Illinois.

The victim, Keith D., was born in September 1985; Stewart was born in August 1957. Stewart, 799 N.E.2d at 1015. In 1999, Keith lived in DeKalb, Illinois with his mother Kimberly K. and Kimberly's fiancé Mark K. Id. Stewart lived alone in an apartment in Lombard, Illinois. Id. Mark was then in the process of earning his Ph.D. and thus spent very little time with Keith, who suffered from attention deficit disorder, received counseling, and was a withdrawn and awkward teen with few friends. Id.

In July or August 1999, Kimberly and Keith attended a party at the home of Chris K., Mark's brother, in Wheaton, Illinois. Id. at 1016. Stewart, who worked with Chris, also attended. Id. The Illinois Appellate Court's Opinion does not specify whether this was the first time Keith and Stewart met. At any rate, during this party Kimberly observed Keith sitting in Stewart's lap, with Stewart's arms around Keith. Id. Kimberly immediately instructed Keith to get up, and scolded Stewart for his behavior. Id.

There was apparently no further interaction between Stewart and Keith until Labor Day weekend of 1999, when Stewart invited Keith and Kimberly to a motorcycle racing event. Id. Kimberly declined the invitation. Id. Nearly three months later, Kimberly and Keith attended a Thanksgiving dinner at Chris' home. Id. Stewart was present, and, apparently attempting to make amends, told Kimberly that he had very few male friends and missed Keith, who he said reminded him of himself when he was younger. Id. Stewart indicated to Kimberly that he was therefore interested in becoming Keith's mentor. Id. Because Mark was largely absent from Keith's life, Kimberly agreed. Id.

2

In December 1999, Stewart began to spend time with Keith. Id. Stewart initially took Keith to his workplace and video game arcades. Id. Later, they began to go swimming together and watch movies at Stewart's apartment. Id. at 1017. These social engagements occurred roughly once every two weeks throughout the early winter of 1999. Id. There is no indication that Stewart behaved inappropriately towards Keith during these outings. In January 2000, however, Keith began spending nights in Stewart's apartment. Id. Kimberly and Keith's testimony conflicts regarding the frequency of these overnight visits – Keith asserted he spent approximately every other weekend until the end of the school year at Stewart's apartment, while Kimberly testified that Keith spent two or three weekends with Stewart from January through March 2000. Id. at 1016-17. During these weekends, Keith testified, Stewart sexually abused and assaulted him. The Illinois Appellate Court summarized Keith's testimony as follows.

> Keith experienced chronic back pain and asked defendant for back massages. Defendant suggested that Keith lie on defendant's bed and remove his shirt. The first time Keith received a massage, defendant massaged only Keith's back. While giving Keith a second massage, defendant suggested that Keith remove his pants so that defendant could massage his legs. Keith removed his pants but not his underwear. Defendant massaged Keith's legs and then began to massage Keith's buttocks over his underwear. Keith thought that this was "weird" and therefore rolled over onto his back. The massage ended, and Keith dressed.
> On another occasion, Keith was ready to go to sleep on the pull-out bed in defendant's living room when defendant gave Keith another massage. A pornographic film was playing at the time. Keith removed his pajamas and was dressed in only his underwear. Defendant began massaging Keith's back and legs. He then rolled Keith onto his back, removed Keith's underwear, and began massaging Keith's penis. Defendant said it was part of a full body massage. When Keith became erect, defendant put his mouth on Keith's penis until Keith ejaculated. Defendant then sat on the side of the bed and masturbated. Defendant said he could go to jail and asked Keith to promise not to tell anyone about what they had done.
> Keith estimated that defendant gave him massages during more than half of the occasions that Keith spent the weekend. Defendant touched Keith's penis during 25% to 50% of those massages. There were one or two other occasions when defendant put his mouth on Keith's penis while they were in defendant's bedroom.

3

> On one occasion after defendant had used his hand to massage Keith's penis, defendant stated that it was only fair that Keith did the same to him. Keith touched defendant's penis but quickly removed his hand. These incidents always began with massages. During one massage, defendant kissed Keith's nipples. On another occasion, while Keith and defendant were in the living room, defendant put some type of liquid on his finger and inserted it into Keith's anus. After this, Keith told defendant that he did not want any more massages, and defendant stopped giving them.

Id. at 1017-18.

At some unspecified point in the spring of 2000, Keith became less receptive to Stewart's attention. Keith stopped talking to Stewart over the telephone, and indicated to Kimberly that he no longer wished to spend time with Stewart. Id. at 1016. Keith, however, apparently did not inform Kimberly of Stewart's inappropriate conduct at this time. Kimberly communicated Keith's wishes to Stewart, who reacted by calling Keith numerous times on the telephone, and sending him letters and emails. Id. The Appellate Court's Opinion does not reveal the contents of these letters and emails. At an unspecified later point in the spring of 2000, Kimberly "cut off" the relationship between Keith and Stewart. Id.

Stewart, however, persisted in contacting Keith. In May 2000, he offered to give Kimberly and Mark two airline tickets if they would allow him to take Keith to Disney World. Id. They declined the offer. Id. In May or June 2000, he arrived with a "wave runner" at Kimberly and Mark's home and invited Kimberly and Keith to go out with him. Id. They again declined the offer. Id. Approximately two weeks later, Stewart asked if he could speak with Kimberly in person. Id. Kimberly and Mark met Stewart in a DeKalb restaurant, where Kimberly reiterated to Stewart that Keith no longer wished to see him. Id. at 1017. Stewart replied that he missed Keith, and asked for forgiveness and another chance. Id. Kimberly then

4

asked Stewart what he had done that would necessitate forgiveness and another chance. Id. Stewart merely replied, "I'm sorry, I'm sorry." Id. Kimberly then informed Stewart that if he continued to attempt to contact Keith, she would call the police. Id.

Undeterred, Stewart sent Keith a birthday card, a gift, and a typed letter in September 2000. Id. The letter stated in part,

> It hurts me to think that you are afraid of me or that you think I would hurt you. I have never hit you, threatened you, or forced you to do anything, so I don't understand, why you would think that. I am sorry if I hurt you in anyway [sic], I never meant to.

Id. Shortly thereafter, Stewart called Kimberly at work, apologized again, and again asked for another chance. Id. Kimberly informed Stewart that she and her family would have nothing further to do with him. Id. She then contacted the DeKalb police department, seeking a restraining order against Stewart. Id. The DeKalb police referred her to the Lombard police department. Id.

On September 28, 2000, a senior criminal investigator with the DuPage County Children's Center, in connection with the Lombard police department, interviewed Keith. Id. at 1018. On October 6 and 8, 2000, the investigator, pursuant to Keith's consent and judicial authorization, recorded telephone conversations between Keith and Stewart. Id.

The following are excerpts from the October 6, 2000 conversation:

KEITH: My mom keeps on asking what you did to me.
MR. STEWART: What do you mean, what I did to you?
KEITH: Um. You know what we did.
MR. STEWART: What do you mean? Playing around?
KEITH: Um-hum.
MR. STEWART: Did you tell her?
KEITH: No, I didn't tell her. She's trying to send me to a psychiatrist to tell what you did to me.

5

MR. STEWART: Why does she think I did something to you?
KEITH: Because you wanted to see me like on a weekly basis.
MR. STEWART: Well, isn't that what friendship is all about?
KEITH: But what we did was not friends, what friends should do.
MR. STEWART: No, I know, but I told you that's not the kind of friendship I wanted. And then I mean it was my fault, it was kind of your fault, you know, asking me for the things you were asking me, I should have just said no.
KEITH: Well, I do miss going over to your house, but not the things that you did.
MR. STEWART: I know. I mean, like I said, I didn't want that. I honestly did not want that, but I can't change the past. If I can't have a chance to be friends with you and prove it, you know I don't know what to do. I mean, I never forced you, you never said no.
KEITH: But what you did was wrong.
MR. STEWART: I know it was wrong, Keith, what do you want me to say[?] I already said I'm sorry, I don't know what you expect from me.
KEITH: But why did you bring sex into the relationship with me?
MR. STEWART: Keith, I gotta go. I gotta go back to work.
KEITH: If we keep on being friends would you do any of those things?
MR. STEWART: No, I would not Keith. I wanted to try to make it up to you but you would never go with me anywhere so I could prove it.

The following are excerpts from the October 8, 2000 conversation:

KEITH: I'm confused about what happened between us.
MR. STEWART: Well, it never should have happened.
KEITH: Any why is that?
MR. STEWART: Because of the age difference. I mean, I care about you a lot and I love you a lot, and I wanted you to be like a son, not like a lover.
KEITH: But you treated my like a lover.
MR. STEWART: How was that?
KEITH: The sex.
MR. STEWART: But I told you I didn't want that.
KEITH: Why?
MR. STEWART: Because of the age difference. I can go to jail for the rest of my life, Keith.
KEITH: Then why did you do it?
MR. STEWART: I don't know. I thought that's what you wanted. I mean, you're asking me to buy the blow-up doll, you're asking me to get you pornos, I catch you looking at pornos on my computer. You didn't say no.
KEITH: If you loved me and you could go to jail, then why did you do it, do those things?
MR. STEWART: I thought that's what you wanted. I wanted to make you happy, Keith, I just wanted you to be friends with me and I was gonna do whatever it took

6

> to keep you as a friend.
> KEITH: But I never asked for it.
> MR. STEWART: No, you didn't, but you never said no either. Except that one time and I said okay. If you would have said no the very first time, then it would have ended right there.
> KEITH: Do I tell my mom about the sex stuff?
> MR. STEWART: I'm telling you, Keith, if you tell your mom about that I will be in jail for the rest of my life.

Id. at 1019-20. On October 12, 2000, Lombard police officers arrested Stewart. Id. at 1020.

## B. Procedural History

A DuPage County jury found Stewart guilty of aggravated criminal sexual abuse and criminal sexual assault of a minor, and the Circuit Court sentenced him to consecutive terms of seven and ten years imprisonment. Id. at 1014. On appeal, Stewart asserted that the Circuit Court erred in (1) refusing to suppress the recorded telephone conversations between him and Keith; (2) reading to the jury venire allegations in counts that had been dismissed; and (3) admitting photographs of the victim and Stewart's apartment. Id. The Appellate Court affirmed. Id. On May 24, 2004, the Illinois Supreme Court denied Stewart's Petition for Leave to Appeal.

Stewart filed a petition for postconviction relief in state court, asserting a slew of fifteen separate arguments. The Circuit Court dismissed the petition. People v. Stewart, No. 00-2751 (Ill. Cir. Ct. Jan. 11, 2005). The Appellate Court affirmed. People v. Stewart, No. 05-176 (Ill. App. Ct. Jan. 25, 2007). The Illinois Supreme Court denied Stewart's Petition for Leave to Appeal on May 31, 2007.

Stewart filed the instant § 2254 Petition pro se on October 24, 2007. He raises the following claims: (1) the trial court erred in admitting tapes of his conversations with the victim; (2) the indictment improperly charged him with three separate crimes related to one criminal act;

7

(3) the verdict forms did not specify which count he was convicted of; (4) the indictment was improperly vague; (5) his conviction for aggravated criminal sexual abuse should have been merged as a lesser included offense with criminal sexual assault; (6) the prosecutor made improper comments regarding his failure to testify or present evidence at trial; (7) trial counsel was ineffective; (8) appellate counsel was ineffective; and (9) postconviction appellate counsel was ineffective. The Petition is fully briefed and before the Court.

## II. DISCUSSION

### A. Standard of Decision

Stewart's Petition is governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which sets a high hurdle for habeas relief. The statute states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's decision is "contrary" to clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [it]." Owens v. Frank, 394 F.3d 490, 496 (7th Cir. 2005) (quoting Williams v. Taylor, 529 U.S.

362, 405 (2000)). A state court's decision is an "unreasonable application" of clearly established Supreme Court law if the state court "identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular prisoner's case" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407; see also Owens, 394 F.3d at 496. In order for a state court decision to be considered "unreasonable" under this standard it must be more than incorrect, it must lie "well outside the boundaries of permissible differences of opinion." Hardaway v. Young, 302 F.3d 757, 762 (7th Cir. 2002); see also Schultz v. Page, 313 F.3d 1010, 1015 (7th Cir. 2002) ("The state court decision is reasonable if it is minimally consistent with the facts and circumstances of the case").

Before reviewing the Illinois courts' decisions, however, the court must determine whether Stewart fairly presented his federal claims to the state courts. Section 2254 requires a habeas petitioner to exhaust the remedies available in state court prior to pursuing federal habeas relief. See 28 U.S.C. § 2254(b)(1)(A). Any claim not presented to the state's highest court is deemed procedurally defaulted. O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999).

In addition to exhausting the remedies available in state court, a habeas petitioner is procedurally barred from raising claims in a federal habeas court that he did not raise in the state court proceedings. See O'Sullivan, 526 U.S. at 848 (holding that a petitioner's failure to present three claims to the Illinois Supreme Court for discretionary review resulted in a procedural default of those claims). Fair presentment of a constitutional claim requires a habeas petitioner to present both the operative facts and the controlling legal principles to the state court before

bringing the claims to a federal habeas court. Cf. Rodriguez v. Scillia, 193 F.3d 913, 916 (7th Cir. 1999) (discussing exhaustion of claim) (citing Picard v. Connor, 404 U.S. 270, 277 (1971)). Thus, a habeas petitioner procedurally defaults, or waives, any claim raised for the first time in federal court.

Also, federal habeas courts cannot review claims that the state court has disposed of on state law grounds. See Stewart v. Smith, 536 U.S. 846, 860 (2002); see also Lambrix v. Singletary, 520 U.S. 518, 523-24 (1997) (noting that where "the state law determination is sufficient to sustain the decree, any opinion . . . on the federal question would be purely advisory.") (citing Herb v. Pitcairn, 324 U.S. 117, 125-26 (1945)). Put another way, federal habeas relief is not available if the state court decision rests on state law that "is independent of the federal question and adequate to support the judgment." See Coleman v. Thompson, 501 U.S. 722, 729 (1991).

A federal court may not grant habeas relief on a defaulted claim unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. See Edwards v. Carpenter, 529 U.S. 446, 450-52 (2000); Coleman, 501 U.S. at 750; Anderson v. Cowen, 227 F.3d 893, 899 (7th Cir. 2000). With the above principles in mind, the Court examines Stewart's Petition.

## B. Stewart's Claims under § 2254

### 1. *The trial court's admission of Stewart's telephone conversations with Keith*

There was a clerical error in the judicial order authorizing the taping of Stewart's October 2000 conversations with Keith – the order named a Maria Reyes, instead of Keith, as the party

10

consenting to the eavesdrop. Stewart, 799 N.E.2d at 1020. On direct appeal, Stewart asserted that the Circuit Court should therefore have suppressed the tapes. Id. The Appellate Court determined, however, that this mere "scrivener's error" was insufficient to warrant suppression. Id. at 1022. In his instant Petition, Stewart repeats this argument, and also asserts that he was denied his Constitutional right to a fair trial when (1) "unsealed and unprotected" copies of the tapes were allowed into evidence, and (2) the original tapes were not sealed immediately.

As to Stewart's assertion that the authorization order was defective, the Illinois Appellate Court disposed of this claim on state law grounds. It is therefore not cognizable in a federal habeas petition. "We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)).

As to Stewart's claim that the tapes or copies of the tapes were improperly handled, the Court first notes that the documentation Stewart submits in support of this claim does not conclusively establish any impropriety on the part of law enforcement. Without more, the Court cannot make any factual finding that such impropriety occurred. More importantly, however, even if this claim were factually accurate, it would amount to nothing more than a technical violation of Illinois statutory law regarding judicial supervision of law enforcement use of eavesdropping devices. See 725 ILL. COMP. STAT. 5/108A-1, et seq. The Circuit Court's denial of the motion to suppress, and the Appellate Court's affirmation of that decision, thus did not violate any clearly established federal law. See 28 U.S.C. § 2254(d) (establishing the criteria for habeas relief). Stewart's first claim under § 2254 therefore fails.

11

### 2. *Claims (2) - (6)*

Stewart's claims (2) - (6) are that: (2) the indictment improperly charged him with three separate crimes related to one criminal act; (3) the verdict forms did not specify which count he was convicted of; (4) the indictment was improperly vague; (5) his conviction for aggravated criminal sexual abuse should have been merged as a lesser included offense with criminal sexual assault; and (6) the prosecutor made improper comments regarding his failure to testify or present evidence at trial. Stewart presented claims (2) - (6) in his postconviction petition to the Circuit Court, but asserted only that the Circuit Court's dismissal was untimely and that his trial counsel was ineffective in his postconviction appeal. Ex. I and Ex. J, Resp.'s Answer. Stewart also did not raise claims (2) - (6) in his direct appeal. Stewart, 799 N.E.2d at 1014. Petitioner has thus failed to raise these claims for one full round of review in the Illinois state court system, and they are therefore procedurally defaulted. See O'Sullivan, 526 U.S. at 845 (§ 2254 petitioners "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."); Howard v. O'Sullivan, 185 F.3d 721, 725 (7th Cir. 1999) ("Before a federal court can entertain a petition for habeas corpus, a state prisoner must exhaust her state remedies, presenting her claims fully and fairly to the state courts."); Helton v. McAdory, 100 Fed. Appx. 576, 578 (7th Cir. 2004) ( "By failing to fairly present his federal speedy trial claim to each level of state court, he procedurally defaulted the claim."). Stewart has shown no cause for failing to raise these issues or prejudice therefrom, nor has he demonstrated that the Court must ignore the default "to prevent a fundamental miscarriage of justice." Guest v. McCann, 474 F.3d 926, 930 (7th Cir. 2007). Stewart's claims (2) - (6) under § 2254 therefore fail.

### 3. *Ineffective assistance of counsel at trial*

Stewart asserts that his trial counsel was constitutionally ineffective for: (a) drawing attention to his sexual orientation during voir dire but failing to inquire into possible bias in all potential jurors; (b) conceding Stewart's guilt during opening statements and closing arguments; (c) failing to investigate a photograph of the victim and failing to present evidence that would contradict the victim's testimony; (d) failing to cross-examine Keith regarding allegedly inconsistent statements; and (e) failing to move to suppress tapes of conversations between Stewart and Keith based on the improper sealing of the tapes.

Respondent asserts that several of these claims are procedurally defaulted, as Stewart did not present them for one full round of state court review. It is clear that claims of ineffective assistance of counsel are subject to the same procedural default rule as are other claims brought under § 2254. Lewis v. Sternes, 390 F.3d 1019, 1032 (7th Cir. 2004) ("habeas petitioners must present their claims of attorney ineffectiveness to the state courts before seeking relief in federal court."). Sims correctly asserts that Stewart did not present each of his instant ineffective assistance of counsel claims at all three levels of state postconviction review. Petitioner did, however, did present a claim of ineffective assistance of counsel at all three levels of his state court postconviction petition proceedings. Petition for Postconviction Relief, Ex. G, Resp.'s Answer; Pet. Br., Ex. I, Resp.'s Answer; PLA, Ex. M, Resp.'s Answer. The Court will therefore, with an abundance of caution, adjudicate Stewart's claims of ineffective assistance of counsel on their merits.

In order to establish that his trial counsel was ineffective, Stewart must "show that [his] counsel's performance was deficient, and that the deficiency prejudiced [his] defense." See

13

Wiggins v. Smith, 539 U.S. 510, 521 (2003) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). An attorney's performance is deficient if it falls "below an objective standard of reasonableness." Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 688). Prejudice is established by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Beneficl v. Davis, 357 F.3d 655, 662 (7th Cir. 2004) (quoting Strickland, 466 U.S. at 694).

When a court reviews an ineffective assistance of counsel claim, the court's review is "highly deferential" to the attorney, "with the underlying assumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.'" United States v. Holman, 314 F.3d 837, 840 (7th Cir. 2002) (quoting Strickland, 466 U.S. at 689). There is therefore a strong presumption that Stewart's counsel at trial performed reasonably. See Strickland, 466 U.S. at 690; see also Cooper v. United States, 378 F.3d 638, 641 (7th Cir. 2004). To succeed in his claim, Stewart must show "errors so serious that counsel was not functioning as the 'counsel' guaranteed [to him] by the Sixth Amendment . . . ." See Holman, 314 F.3d at 839 (quoting Strickland, 466 U.S. at 687).

The Court first notes that Stewart has asserted five discreet instances in which his attorney was allegedly ineffective. The Seventh Circuit takes a dim view of this approach. "A claim of ineffective assistance of counsel cannot be carved up into little segments. Isolated shortcomings do not make a lawyer ineffective; it is the entire course of the representation that matters." Duarte v. United States, 81 F.3d 75, 77 (7th Cir. 1996) (citing Strickland, 466 U.S. at 698-96). As the Court will explain, none of Stewart's allegations, taken individually or cumulatively, establish that his counsel at trial was constitutionally ineffective.

14

Several of the instances in which Stewart claims his attorney was ineffective are better categorized as routine examples of trial strategy. These instances are: (a) counsel's inquiry into some but not all jurors' potential bias against homosexuals; that part of claim (c) in which Stewart asserts that counsel should have presented certain evidence to impeach Keith's testimony; (d) counsel's decision not to cross-examine Keith's allegedly inconsistent statements; and (e) counsel's decision not to move to suppress the tapes on the grounds that they were improperly sealed. The court is reluctant to engage in second guessing, or "Monday morning quarterbacking," regarding counsel's strategic decisions in this case, see Harris v. Reed, 894 F.2d 871, 877 (7th Cir. 1990), especially where there were likely solid reasons for counsel's actions. For example, counsel could reasonably have thought it unwise to overemphasize Stewart's sexual preferences during the voir dire, given the nature of the allegations in this case. Counsel may have also been concerned that an overly aggressive cross-examination of Keith, or a forceful impeachment of his testimony, would cause the jurors to sympathize with Keith. Finally, counsel did file a motion to suppress the tapes, albeit on other grounds from the one Stewart now advocates. Stewart, 799 N.E.2d at 1022 (affirming the Circuit Court's denial of Stewart's motion to suppress). Although Stewart obviously disagrees with counsel's strategy, there is simply no indication that counsel, in making these decisions, made "errors so serious that counsel was not functioning as the 'counsel' guaranteed [to him] by the Sixth Amendment . . . ." See Holman, 314 F.3d at 839 (quoting Strickland, 466 U.S. at 687).

Stewart next asserts that counsel was ineffective because he conceded Stewart's guilt during opening statements and closing arguments. This assertion is meritless. The trial

15

transcript reveals that counsel did unfortunately misspeak twice during opening statements, but he immediately corrected himself and in no way conceded that Stewart was guilty.

> COUNSEL: We believe that the evidence, the evidence that they did tell you that they'd show you, will be largely impeached or proved to be unreliable through cross-examination, and this will enable you to find William Stewart guilty – not guilty beyond a reasonable doubt on all charges . . . At the conclusion of the evidence, I am going to ask each and every one of you to sign a guilty – a not guilty verdict on all charges against Bill Stewart, because the evidence will substantiate it.

Petitioner's (G) Ground Seven G2 Exs. The transcript also reveals that, during closing arguments, counsel mentioned that the tapes were evidence of some "hugging and kissing" that may have occurred between Stewart and Keith. The transcript also reveals, however, that counsel did so in an attempt to minimize the impact of this evidence, and in fact denied that there was any evidence of serious sexual contact between these two individuals.

> COUNSEL: The audio tapes. The audio tapes did . . . allude to some sexual activity. They alluded to hugging and kissing. Maybe more, you say, maybe more. But then we're just guessing. Then we're using speculation and innuendo, and that doesn't belong in a courtroom. There's got to be guilt beyond a reasonable doubt. The highest threshold in our land in our judicial system. Not guess, not conjecture, not speculation. So in those audio tapes, kissing and hugging, I guess that was admitted to. But the sucking of the penis directly, [absolutely not]. And the finger in the anus, no way, no mention of that.

Id. There is therefore no factual basis on which the Court could conclude that Stewart's counsel conceded Stewart was guilty during either opening statements or closing arguments.

Finally, Stewart asserts that counsel was ineffective for failing to properly investigate a photograph of Keith that the state introduced at trial. In support of this assertion, Stewart argues that counsel should have been aware that this photo was taken approximately one year before the offenses in this case took place. Although Stewart does not make his argument explicit, he presumably means to assert that had counsel been aware of the fact that the photo showed Keith

at a younger age, counsel could have moved to suppress it. The problem for Stewart is that the Illinois Appellate Court has already determined that the photo was properly introduced into evidence.

> The admission of Keith's photo did not deprive defendant of a fair trial. According to Kimberly's testimony, defendant and Keith became friends during the summer of 1999, less than one year after the photo was taken. There is no indication that Keith's appearance changed dramatically between the beginning of the seventh grade and the beginning of the eight grade. The jury heard when the photograph was taken and therefore was able to consider that the photo was somewhat dated.

Stewart, 799 N.E.2d at 1024. Stewart's counsel therefore cannot have been constitutionally ineffective for failing to engage in what would have been a futile investigation, or for failing to file what would arguably have been a frivolous motion to suppress.

For all of the above reasons, the Court finds that Stewart's counsel at trial was not constitutionally ineffective. Stewart's seventh claim under § 2254 therefore fails.

### 4. Ineffective assistance of counsel on direct appeal

Sims correctly asserts that Stewart has procedurally defaulted this claim. Stewart argued that his appellate counsel was ineffective in his postconviction petition, but following the Circuit Court's denial of that petition, he failed to raise this claim on appeal. See O'Sullivan, 526 U.S. at 845 (§ 2254 petitioners must present constitutional claims for one full round of state court appellate review). Even if this claim were not defaulted, however, it would be meritless. Stewart asserts that his appellate counsel was ineffective for failing to raise each and every one of the above issues on appeal. The Seventh Circuit frowns on such assertions. "Appellate lawyers are clearly not incompetent when they refuse to follow a 'kitchen sink' approach to the issues on appeal." Whitehead v. Cowan, 263 F.3d 708, 731 (7th Cir. 2001); see also Gray v. Greer, 778

F.2d 350, 353 (7th Cir. 1985) ("the right to effective assistance of appellate counsel does not require an attorney to advance every conceivable argument on appeal which the trial record supports."). Moreover, Stewart has failed to demonstrate that the issues he claims appellate counsel failed to raise "would clearly have been more likely to result in reversal or an order for a new trial, and were so obvious from the trial record that the failure to present such issues amounted to ineffective assistance of appellate counsel." Gray, 778 F.2d at 353. Stewart's eighth claim under § 2254 therefore fails.

### 5. *Ineffective assistance of counsel on postconviction appeal*

In addition to asserting that his counsel was ineffective at trial and on direct appeal, Stewart argues that his counsel was ineffective during his postconviction appeal. This claim, however, is not cognizable in a § 2254 petition. "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding under section 2254." 28 U.S.C. § 2254(i); see also Szabo v. Walls, 313 F.3d 392, 397 (7th Cir. 2002). Stewart's ninth and final claim under § 2254 therefore fails.

## III. CONCLUSION

For the foregoing reasons, Stewart's Petition for Writ of Habeas Corpus – Person in State Custody, filed pursuant to 28 U.S.C. § 2254, is denied.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATED: 7-2-09